# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CTI CLINICAL TRIAL SERVICES, INC.,
Plaintiff,

vs.

GILEAD SCIENCES, INC.,
Defendant.

Case No. 1:10-cv-491
Weber, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff CTI Clinical Trial Services, Inc. (CTI) brings this action against defendant Gilead Sciences, Inc. (Gilead) alleging a breach of the parties' contract governing the provision of services in connection with a clinical drug trial. This matter is before the Court on the parties' motions for summary judgment as to plaintiff's claims for breach of contract and claims seeking damages under equitable theories of recovery. (Docs. 43, 45, 46).

## I. Undisputed Facts

The parties have submitted proposed findings of fact and conclusions of law in support of their motions for summary judgment. (Doc. 43; Doc. 45, Exh. 1; Doc. 46, Exh. 1). Gilead has color-coded CTI's proposed findings of facts and conclusions of law to indicate its level of agreement with CTI's proposed findings of fact and conclusions of law pursuant to the district judge's Order of November 1, 2010 (Doc. 16 - "Scheduling Order and Pretrial Procedures"). (Doc. 64, Exh. 1). The Court has gleaned the following findings of fact from Gilead's color-coded submission, the undisputed allegations of the complaint, the parties' memoranda, and the evidence of record.

Plaintiff CTI is a clinical research organization (CRO) in the business of, among other activities, providing services to companies engaged in the clinical development of pharmaceutical products. (Doc. 2, ¶ 2). In that role, CTI conducts worldwide clinical studies pursuant to established protocols to assist companies in testing and evaluating new pharmaceutical products and/or new uses for pharmaceutical products. (Id.).

Defendant Gilead is a biopharmaceutical company that develops medicines in various therapeutic areas, including HIV/AIDS, hepatitis, respiratory and cardiovascular disease, cancer, and inflammatory diseases. (Doc. 46 at 6)[1]. Gilead hires CROs such as CTI to help facilitate its clinical studies. (Id.).

In October of 2008, Gilead approached CTI about submitting a bid to provide clinical trial services in connection with Gilead's clinical study of Gilead's Ambrisentan drug for a new medical purpose involving the treatment of Chronic Allograft Injury in kidney transplant recipients (the "Study"). (CTI FOF Nos. 1, 2)[2]. The Study was to take place over 39 months in several regions around the world. (CTI FOF No. 1). Although CTI initially declined to submit a bid, it subsequently reversed its decision and chose to bid on the Study. (Doc. 50, Depo. of Annemarie Vance, Gilead Associate Director, Clinical Trial Management, p. 36). CTI ultimately submitted a limited bid to provide clinical trial services to Gilead in connection with the Study in North America, Europe, Australia, and New Zealand. (CTI FOF No. 5). Gilead accepted the bid. (CTI FOF No. 6).

The parties entered into the CTI Master Services Agreement (MSA) effective April 17, 2009 (Doc. 43, Exh. 1), and Work Order Number 1 for Study No. GS-US-244-0101 under CTI Master Services Agreement (Work Order 1) effective April 30, 2009 (Doc. 43, Exh. 2)

---

[1] All page references, except for the deposition page references, are to the ECF page identification number.
[2] Each "CTI FOF" is a finding of fact submitted by CTI that is not disputed by Gilead.

(collectively, the "Agreement"). The MSA contains an integration clause at § 10.11, which

provides:

> This Agreement, together with any attachments and exhibits referenced herein,
> and any Work Orders entered into as of the Effective Date, set forth the complete,
> final and exclusive agreement between the Parties and supersedes and terminates
> all prior agreements and understandings between the Parties relating to the subject
> matter of this Agreement, provided that the confidentiality obligations contained
> in any prior agreement between the Parties and any confidentiality agreement
> entered into between the Parties shall continue in full force and effect in
> accordance with its terms. . . .

(Doc. 43, Exh. 1, MSA, p. 14). The MSA also includes a scope of work provision at § 3.3,

which states:

> Unauthorized Work: CTI will not perform work outside the scope of a Work
> Order or exceed expenses under a Study Budget without the prior advance written
> authorization from a duly authorized Gilead representative. CTI shall notify
> Gilead in writing of any actual or potential out of scope work and related
> expenses (or Pass-through Expenses) within 10 business days of CRO's first
> knowledge of such actual or potential out of scope work and related expenses.
> Gilead will consider any such reasonable actual or potential out of scope work
> and related expenses in CTI's notice. The Parties will discuss in good faith and
> use commercially reasonable efforts to mutually agree upon the treatment of any
> actual or potential out of scope work and related expenses of which Gilead has
> been notified pursuant to this section; however, Gilead shall not be under any
> obligation to pay CTI for any out of scope work that is not authorized by both
> Parties in a written amendment for Services under a Work Order and its
> applicable Study Budget.

(Doc. 43, Exh. 1, MSA, p. 5). Pursuant to the Agreement, CTI agreed to provide clinical

study support services, including monthly project and site management and specific task-based

services. (CTI FOF No. 11). The MSA set forth the basic obligations of the parties. (CTI FOF

No. 9). Work Order 1, which was negotiated and executed pursuant to the MSA, set forth the

details of the Study, including specific service requirements, payment schedules, and "bid grids"

which show the volume of services to be performed. (CTI FOF No. 10).

The Agreement allocated a certain percentage of CTI's management costs associated with the Study to "milestones" and set out a structure for the billing of those costs. Section 4.1 of the MSA states:

> (a) Direct Expenses. Unless otherwise agreed to in a particular Work Order, CTI will submit invoices to Gilead that itemize Direct Expenses payable for Services performed or project milestones met under this Agreement. . . .

(Doc. 43, Exh. 1, MSA, p. 5). The Work Order states:

> Units for respective line items in the budget grid directly relate to the respective milestone. 30% of cost associated with project management and sites management are allocated to milestones. The remainder may be billed out monthly throughout the project.

(Doc. 43, Exh. 2, Tab II, Work Order 1, Exh. II, § IX.A.1 (Payment Terms), p. 60).

Work Order 1 includes a budget grid summary. (Doc. 43, Exh. 2, Tabs III, IV, Work Order 1, Exhs. III, IV). The summary states that for given tasks the billing schedule will be as follows: "Project Management Fees (70%) to be billed Monthly for Total Project Duration (Tables L1-L12)" and "Site Management Fees (70%) to be Billed Monthly for the Total Duration of the Project (TASK H2[3] within Section H)." (*Id.*). The grid lists the number of projected months for the Study as 39. *Id.*

Work Order 1 required Gilead to pay monthly project and site management fees consisting of two types of payments: (1) fees comprising 70% of the contracted amount owed for monthly project and site management ("Monthly Management Fees"); and (2) fees comprising the remaining 30% of the contracted amount for these management services ("Deferred Management Fees."). The Monthly Management Fees were to be paid each month, while payment of the 30% portion of the management fees was deferred.

---

[3] "H2" is "In-House Site Management" and "L1" is Program Management. (Doc. 43, Exh. 2, Work Order 1, Exh. III).

Under the express terms of the MSA, in the event of a conflict between the terms of the

MSA and the Work Order, the MSA generally controls pursuant to MSA § 10.11, which states:

> If there is any conflict between the terms of any Work Order and this Agreement,
> the conflict shall be resolved by interpreting the provisions in the following order
> of priority: (1) this Agreement, and (2) the Work Order, unless specifically stated
> otherwise, and except that the terms of the Work Order shall govern as to the
> specific services in the Work Order.

(Doc. 43, Exh. 1, MSA, p. 1).

The Study commenced on May 1, 2009. (CTI FOF No. 13). Approximately five months

into the Study, Gilead received formal notification from the Food and Drug Administration

(FDA) that Gilead would be required to perform an additional study in order to receive the

desired market approval for the Ambrisentan drug. (CTI FOF NO. 15). Subsequently, on

September 22, 2009, Gilead instructed that "all activities toward initiation of the Phase 3 study

be paused immediately while we evaluate this new input." (CTI FOF No. 17). CTI promptly

halted all Study activities except for project and site management and the completion of pre-

study site visits that had already been started. (CTI FOF No. 18). Gilead approved certain

ongoing project and site management and pre-study site visits during the "pause" period. (CTI

FOF No. 19).

The MSA's termination provisions require 60-days written notice to terminate the MSA

and Work Order 1. (CTI FOF No. 22). Section 9.2(c) of the MSA, "Termination of a Work

Order by Gilead," states: "Gilead may, at any time, terminate any Work Order effective sixty

(60) days after providing prior written notice to CTI. . . ." (Doc. 43, Exh. 1, MSA, p. 12). The

60-day period between notice of termination and the effective termination date is the "Notice

Period." During the Notice Period, § 9.3 of the MSA imposes the following obligations on the

parties:

Wind-Down Obligations; Final Accounting. In the event of notice by either Party of termination of this Agreement or any Work Order, each Party will cooperate in good faith with the other party to wind-down and terminate or transition, at Gilead's discretion, to another service provider, any Services then in progress that are affected by such termination and will perform such additional acts as are reasonably necessary in order to effect such wind down or transitions of the services. . . . Gilead will Pay CTI within forty-five (45) days after receipt of the approved accounting or upon mutual agreement of the final amount due for:

(a) all unpaid and undisputed amounts for Services rendered and expenditures made by CTI in accordance with this Agreement and the applicable Work Order prior to the effective date of termination; and

(b) expenses resulting from reasonable noncancelable obligations that CTI properly incurred for the Services in accordance with a Work Order prior to receipt of notice of termination and which CTI used commercially reasonable efforts to cancel after receipt of notice of termination.

(Doc. 43, Exh. 1, MSA, p. 12).

On December 1, 2009, Gilead notified CTI that it had decided to cancel the Study "[b]ased on the feedback from the FDA back in September. . . ." (CTI FOF No. 20). Gilead praised CTI's "hard work, effort [and] advice" and stated that "CTI shines in the CRO arena." (CTI FOF No. 21).

The effective termination date of the MSA and Work Order 1 was January 30, 2010. (CTI FOF No. 23). After Gilead sent its notice of termination, CTI began the process of winding down the Study as required by the MSA. (CTI FOF No. 24). CTI contacted each of the Study sites to inform site staff of Gilead's decision to terminate the Study early. (CTI FOF No. 25). CTI also responded to any questions raised by site staff about the early termination and worked with site staff to ensure that all records were prepared for return to Gilead as required by the MSA. (CTI FOF No. 26). CTI then performed all administrative work necessary to return the Study files to Gilead, although Gilead ultimately instructed CTI not to return the Study file. (CTI FOF No. 27).

6

The parties exchanged a number of communications regarding the final amount owing under the Agreement.  These included a series of emails between Annemarie Vance, Gilead's Associate Director of Clinical Trial Management, and Paul Ritter, Vice-President and General Counsel at CTI, dated December 2, 2009 and January 14, 2010.  (Doc. 43, Exh. 12).  On February 2, 2010, CTI submitted what it considered to be the final invoice, Invoice # GS179801Y (Final Invoice), to Gilead.  (Doc. 43, Exh. 11).  The total amount due on the invoice was $1,048,594.00.  (*Id.*).  A series of email communications between CTI and Gilead representatives followed in which Gilead sought clarification of the Final Invoice and disputed the total amount owing under the Final Invoice.  (Doc. 64, Exhs. 8, 10).  While these email communications were ongoing, and approximately one month after CTI sent its Final Invoice, Vance explicitly instructed Gilead's finance group that "NO invoice should be put through to be paid until we resolve the dispute. . . ."  (CTI FOF No. 44).  The parties were unable to agree on the final amount owing under their Agreement.  (Doc. 43, Exh. 15 - May 13, 2010 letter from Ritter to Sue Wang, Gilead's in-house counsel).  Subsequent to the date CTI issued the Final Invoice, Gilead has not paid any amount to CTI.  (CTI FOF No. 39).  Work Order 1 provides that "[i]f any portion of an invoice is disputed/not approved, then Gilead shall pay the undisputed amount and the parties shall use good faith efforts to reconcile the disputed amounts as soon as possible."  (CTI FOF No. 35).

## II. The summary judgment standard.

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## III. The governing law.

The parties' Agreement is governed by Delaware law pursuant to § 10.2 of the MSA. (Doc. 43, Exh. 1, MSA, p. 12). The Court must therefore look to Delaware law for the applicable rules of contract interpretation.

Under Delaware law, contract interpretation is a question of law. *JFE Steel Corp. v. ICI Americas, Inc.,* 797 F. Supp.2d 452, 469 (D. Del. 2011) (citing *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del. 1992)). In interpreting a contract, the Court is to effectuate the intent of the parties. *Id.* (citing *Lorillard Tobacco Co. v. Am. Legacy*

8

*Found.,* 903 A.2d 728, 739 (Del. 2006)). The first step in effectuating the parties' intent is to determine whether the contract is unambiguous as a matter of law. *See Nw. Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del. 1996); *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.,* 270 F. Supp.2d 476, 481-82 (D. Del. 2003). A contract is ambiguous only if it is fairly or reasonably susceptible to different interpretations. *Esmark,* 672 A.2d at 43.

If a contract is unambiguous, the Court should interpret it as a matter of law. *JFE Steel Corp.,* 797 F. Supp.2d at 469. In such a case, the Court interprets the contract based on the plain meaning of the language contained on the face of the document. *Id.* (citing *GB Biosciences,* 270 F. Supp.2d at 482) ("The use of extrinsic evidence to interpret clear and unambiguous language in a contract is not permitted.") (internal citations omitted); *Lorillard Tobacco,* 903 A.2d at 739). A contract's "[c]lear and unambiguous language . . . should be given its ordinary and usual meaning." *Rhone-Poulenc Basic Chems. Co.,* 616 A.2d at 1195. The contract should be interpreted as it "would be understood by an objective, reasonable third party." *JFE Steel Corp.,* 797 F. Supp.2d at 469 (citing *Estate of Osborne v. Kemp,* 991 A.2d 1153, 1159 (Del. 2010)). The Court must read the contract as a whole and give each provision and term effect. *Estate of Osborne,* 991 A.2d at 1159. Where general and specific provisions conflict, the specific contract provision governs. *DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 961 (Del. 2005).

When two sophisticated parties bargain at arm's length and enter into a contract, the presumption that the contract's language should guide the Court's interpretation is strengthened. *Id.* (citing *Progressive Int'l Corp v. E.I. du Pont de Nemours & Co.,* No. C.A. 19209, 2002 WL 1558382, at **6-7 (Del. Ch. July 9, 2002)). A contract is not rendered ambiguous simply because the parties do not agree on the proper construction. *Rhone-Poulenc Basic Chems. Co.,* 616 A.2d at 1196. When the language of the contract is unambiguous, the plain language of the

contract is all the Court need examine in choosing between the parties' competing interpretations. *JFE Steel Corp.,* 797 F. Supp.2d at 469. In such a case, the Court need not look at any extrinsic evidence. *Id.*

## IV. The parties' motions for summary judgment.

### 1. Defendant Gilead's motion for partial summary judgment on Count I of the complaint (Doc. 45) should be granted.

Defendant Gilead moves for partial summary judgment on Count I of the complaint for breach of contract only insofar as CTI asserts it is due payment for work it would have performed during the Notice Period. CTI alleges there are two components of its total claimed damages of $1,048,599.00 for Gilead's breach of the parties' contract:

> The first component of [CTI's] damages is for services provided by [CTI] to [Gilead] pursuant to the Master Services Agreement and Work Order through December 1, 2009 for which [CTI] has not received payment. These damages total $329,148.

> The second component of [CTI's] damages consist [sic] of revenue which would have been received by [CTI] from December 1, 2009 through January 31, 2010. These damages total $719,446.

(Doc. 45, Exh. 7, CTI's Responses to Gilead's First Set of Interrogatories, No. 5(b). *See also* Doc. 45, Exh. 9, CTI's Initial Disclosures, p. 6). Gilead moves for summary judgment on Count I as to only the second component of CTI's damages claim, *i.e.,* for "revenue which would have been received" during the Notice Period. Gilead argues that CTI seeks compensation for services it contemplated performing, but did not actually perform, during the Notice Period in contravention of the express and unambiguous terms of the parties' contract. Gilead argues that the MSA does not require it to pay for services that CTI never actually performed. Rather, Gilead asserts that § 9.3 of the MSA expressly limits CTI's recovery to payment only for

10

"services rendered and expenditures made by CTI" in accordance with the terms of the MSA and Work Order 1. (Doc. 45 at 5, 10).

CTI opposes Gilead's motion. (Doc. 63). CTI argues it is entitled to the damages it claims in this matter under the "clear and unambiguous language" of § 9.3 of the MSA for "services rendered" by CTI, "expenditures made by CTI," and "expenses resulting from reasonable, noncancelable obligations." (Doc. 63 at 7). In addition, CTI argues that the parties' negotiations "further buttress the plain meaning of Section 9.3" and demonstrate that CTI is entitled to payment "for more than just 'work actually performed'" as Gilead contends. (*Id.*). CTI asserts that Gilead's motion for partial summary judgment should be denied because the full scope of Gilead's liability, including the types of services, expenditures, and obligations for which CTI should be compensated by Gilead, is a matter best left to the jury. (*Id.* at 9).

In its opposing memorandum, CTI does not describe the specific types of services it believes it would have rendered during the Notice Period had the contract not been terminated and for which it believes it is entitled to payment. The complaint describes such damages in only general terms. In Count I of the complaint, CTI claims that Gilead breached its agreement to pay the final invoiced amount owing under the Agreement of $1,048,599.00 (Doc. 2, ¶¶ 23, 29-31; Exh. 5). The complaint alleges that CTI submitted the Final Invoice for this amount to Gilead "per the Agreement, Work Order, payment schedule and budget grid through January 30, 2010. . . ." (Doc. 2, ¶ 23). According to the complaint, the Final Invoice includes the following expenses:

> The February 2, 2010 invoice included payments for services *which would have reasonably been rendered* by CTI during the 60-day notice period from December 1, 2009 through January 30, 2010. Payments that, among other things, allowed CTI to recoup a portion of its substantial start-up costs and expenses: the exact purpose of the 60-day termination notice provision insisted on by CTI.

(Doc. 2, ¶ 24) (emphasis added).[4] CTI has reaffirmed through discovery that it is seeking to recover payments for services it reasonably would have rendered during the Notice Period. (*See* Doc. 45, Exh. 7, CTI Response to Gilead First Set of Interrogatories, No. 5(b): "The second component of [CTI's] damages consist [sic] of revenue which would have been received by [CTI] from December 1, 2009 through January 31, 2010. These damages total $719,446.00.").

However, because CTI has not clarified the precise nature of this component of its damages claim, the issue presented by Gilead's motion for partial summary judgment on Count I of the complaint is generally framed as follows: whether the parties' Agreement requires Gilead to pay CTI for services that CTI *reasonably would have* rendered during the Notice Period had the contract not been terminated, or whether the Agreement requires Gilead to pay CTI for only those services that CTI *actually* rendered during the Notice Period.[5] The Court finds as a matter of law that under the clear and unambiguous terms of the parties' Agreement, CTI is not entitled to recover payments for services CTI reasonably would have rendered during the Notice Period had Gilead not terminated the contract, but which CTI did not actually perform.

Section 9.3 of the MSA states that Gilead is required to make the following payments following termination of the Agreement:

> (a) all unpaid and undisputed amounts for Services rendered and expenditures made by CTI in accordance with [the MSA] and the applicable Work Order prior to the effective date of termination. . . . and

> (b) expenses resulting from reasonable noncancelable obligations that CTI properly incurred for the Services in accordance with a Work Order prior to receipt of notice of termination and which CTI used commercially reasonable efforts to cancel after receipt of notice of termination.

---

[4] In its Final Invoice, CTI sought payment for "revenue which would have been received by [CTI] from December 1, 2009 through January 31, 2010. These damages total $719,446." (Doc. 43, citing Doc. 74, Exh. 2 - breakdown of revenue for services CTI believes it would have performed).

[5] The Court's analysis does not apply to the project and site management fees, which are specifically addressed in the Agreement and are analyzed below in connection with CTI's motion for partial summary judgment (Doc. 43).

(Doc. 43, Exh. 1, MSA, p. 12) (emphasis added). The MSA, by its plain terms, does not authorize the recovery of "payments for services which would have reasonably been rendered by CTI during the 60-day notice period from December 1, 2009 through January 30, 2010" as alleged in the complaint. (Doc. 2, ¶ 24). The language of the MSA clearly authorizes recovery only for "services rendered" during this period. (Doc. 43, Exh. 1, MSA, § 9.3(a), p. 12). Nor are payments for services which reasonably would have been rendered but for the contract termination covered under § 9.3(b), as nothing in the language of that provision extends Gilead's payment obligations beyond expenses that CTI actually "incurred" in contrast to expenses that CTI reasonably would have incurred but for the termination of the contract.

In arguing otherwise, CTI focuses primarily on the intended protections of the Notice Period under the parties' Agreement and the language of the MSA entitling CTI to payment for services performed and expenditures made as part of its contractual obligations. CTI emphasizes that the "clear and unambiguous language" of the MSA requires Gilead to pay for three categories of obligations upon termination of the MSA: (1) "Services rendered;" (2) "expenditures made by CTI;" and (3) "expenses resulting from reasonable non-cancelable obligations." (Doc. 63 at 7). CTI indicates that this language covers all payments claimed, including payments for services which reasonably would have been performed during the Notice Period. However, CTI's interpretation reads additional language into § 9.3(a) that is not in the contract. CTI's interpretation also ignores the qualifying language included in § 9.3(b), which limits Gilead's obligation to pay for "expenses resulting from reasonable noncancelable obligations" that CTI incurred for services "prior to receipt of notice of termination and which CTI used commercially reasonable efforts to cancel after receipt of notice of termination." CTI's interpretation extending the language of § 9.3 beyond its plain terms to encompass work that CTI

13

would have performed had the contract not been terminated is therefore neither reasonable nor valid.

Pursuant to the clear and unambiguous terms of § 9.3 of the MSA, Gilead was required to make payments only for the services actually rendered during the Notice Period; the expenditures actually made during the Notice Period; and the expenses resulting from reasonable noncancelable obligations that CTI actually incurred. Because the contract is clear and unambiguous in this regard, the Court need not look beyond the actual terms of the MSA to discern its meaning as to the limited issue of whether CTI may recover "payments for services which would have reasonably been rendered by CTI during the 60-day notice period from December 1, 2009 through January 30, 2010" as claimed in the complaint. (Doc. 2, ¶ 24). The clear and unambiguous terms of the contract do not allow CTI to recover payments for these services. Defendant Gilead's motion for partial summary judgment on Count I of the complaint (Doc. 45) should be granted.

**2. Plaintiff CTI's motion for partial summary judgment on Count I of the complaint (Doc. 43) should be denied.**

Plaintiff CTI seeks partial summary judgment in its favor on Count I of the complaint, breach of contract, on two grounds: (1) Gilead was required to pay all monthly project and site management fees (Deferred Management Fees and Monthly Management Fees) for the entire nine months spanning the inception of the Study (May 2009) until its effective termination date (January 2010), totaling $416,420.77; and (2) although the full amount that CTI claims is due and owing under the parties' Agreement is disputed, Gilead is obligated to pay the amounts it does not dispute are owed under the parties' Agreement, which the evidence shows is $143,337.92 in monthly project and site management fees. CTI contends this leaves a total

amount of $273,082.85 in monthly project and site management fees owing under the contract, which Gilead disputes but which the evidence allegedly shows CTI is entitled to recover.

The two types of contractual payments at issue with respect to CTI's motion for partial summary judgment are: (1) the Monthly Management Fees, which comprised 70% of the contracted amount owed for monthly project and site management; and (2) the Deferred Management Fees, which comprised 30% of the contracted amount for these management services. Gilead argues that CTI is not entitled to partial summary judgment on Count I of the complaint because CTI cannot establish the absence of genuine issues of material fact on CTI's claim for such fees. (Doc. 64). Gilead argues that CTI is not entitled to recover Deferred Management Fees for any month of the Study, and it is not entitled to the Monthly Management Fees for January 2010. Gilead disputes CTI's interpretation of the contract as it pertains to the payment of these fees, and Gilead challenges CTI's calculations of the payments it claims are owed and the admissibility of evidence that CTI offers in support of its claim. Finally, Gilead asserts CTI violated the parties' Agreement by misallocating the work of its employee purportedly assigned to handle site management.

### A. The parties' interpretations of the Agreement.

The parties offer varying interpretations of the Agreement as it pertains to the monthly project and site management fees, and they dispute the correct calculation of the amount of any such fees Gilead owes CTI under the relevant terms of the Agreement. The parties rely on provisions of the MSA, including §§ 9.3 and 4.1, and billing provisions of Work Order 1 in support of their arguments concerning the amount of project and site management fees owing under the Agreement. Section 9.3 of the MSA provides that CTI was entitled to payment within

45 days after receipt of the "approved accounting" or "upon mutual agreement of the final amount due for" the following:

> (a) all unpaid and undisputed amounts for Services rendered and expenditures made by CTI in accordance with [the MSA] and the applicable Work Order prior to the effective date of termination; and
>
> (b) expenses resulting from reasonable noncancelable obligations. . . .

(Doc. 43, Exh. 1, MSA, § 9.3, p. 12). Section 9.3 does not specifically reference project and site management services.

Work Order 1 specifically addresses project and site management costs. The Work Order sets out a billing structure for the payment of project and site management fees and allocates a portion of such fees to milestones. (Doc. 43, Exh. 2, Tab II, Work Order 1, Exh. II, § IX.A.1 (Payment Terms), p. 60) - "Units for respective line items in the budget grid directly relate to the respective milestone. 30% of cost associated with project management and sites management are allocated to milestones. The remainder may be billed out monthly throughout the project."). Section 4.1 of the MSA in turn provides that CTI will "submit invoices to Gilead that itemize Direct Expenses payable for Services performed or project milestones met under this Agreement. . . ." (Doc. 43, Exh. 1, MSA, p. 5).

CTI claims it is entitled to $273,082.85 in project and site management fees based on § 9.3 of the MSA and the terms of Work Order 1 (as well as on extrinsic evidence). CTI has calculated the amount by taking the total amount of project and site management fees under the contract and prorating the amount over a nine-month period beginning with the start date of the Study and ending with the effective termination date of the Study. (Doc. 43 at 25). CTI notes that pursuant to § 9.3(a) of the MSA, it is entitled to payment of "all unpaid and undisputed amounts for Services rendered," which CTI indicates includes all Deferred Management Fees

16

and all Monthly Management Fees for the nine months of the Study. (*Id.* at 11-12). CTI argues that both the Deferred Management Fees and the Monthly Management Fees are owed under the terms of Work Order 1 specifying that these fees were to be billed monthly for the "Total Duration of the Project," which spanned nine months from May 2009 through January 2010, and Gilead has admitted it owes these fees for all nine months. (Doc. 43 at 13-16, citing Work Order 1, Exh. 2, Tab III, p. 1; Exh. 2, Tab IV, pp. 1-2; Doc. 43, Exhs. 12, 16). CTI acknowledges that under the terms of the Agreement, payment of the Deferred Management Fees was deferred "until certain Study 'milestones' were achieved." (Doc. 43 at 14, citing Work Order 1, Exh. 2, Tab III, p. 1; Exh. 2, Tab IV, pp. 1-2). CTI contends, however, that all project and site management fees were earned each month the Study was in effect and were therefore payable in full under § 9.3 of the MSA, regardless of whether payment of a portion of the fees was deferred. CTI's argument, distilled to its essence, is that the Deferred Management Fees it seeks to collect constitute payment for services CTI had already rendered but for which payment had been deferred pursuant to the payment formula set forth in Work Order 1.

Gilead disputes CTI's contention that the Deferred Management Fees were "already fully earned each month." (Doc. 64 at 17). Gilead asserts that the MSA and Work Order 1 do not support CTI's position. Gilead contends that contrary to CTI's argument, the MSA and Work Order 1 provide that CTI was not entitled to recover the Deferred Management Fees "unless and until certain study milestones [were] met. . . ." (*Id.*). Gilead contends there are genuine issues of disputed fact regarding the Deferred Management Fees because (1) CTI has not provided any evidence that a necessary milestone was ever met so as to make the 30% deferred portion of the fees payable, and (2) the deposition testimony of Vance demonstrates there is an issue of fact as to whether CTI ever achieved the prerequisite milestones. (*Id.* at 19, 19 n.5, citing Doc. 50,

Vance Depo. II, pp. 369-70, 371, 372, 379). In addition, Gilead asserts that CTI is not entitled to the Monthly Management Fees for January 2010. In support of its position, Gilead relies on: (1) § 4.1 of the MSA pertaining to payments for project milestones; (2) the billing provisions found at Work Order 1, Ex. III (p. 1) and Exh. IV (pp. 1-2) (Task H.2) (3) the comment provisions of Work Order 1, and (4) the deposition testimony of Vance that project and site management activities should have been completed in December 2009 so that management fees for January are not owed (Doc. 50, Vance Depo. II, pp. 376, 490-91). (Doc. 64 at 20-21).

**B. CTI is not entitled to summary judgment on its claim for Deferred Management Fees.**

To determine CTI's right to Deferred Management Fees, the Court must first ascertain whether the parties' Agreement clearly and unambiguously establishes CTI's right to payment of such fees under the circumstances presented. There is no dispute that CTI was entitled to payment of all "unpaid" and "undisputed amounts" for services rendered in accordance with the MSA and Work Order 1 "prior to the effective date of termination" of the Agreement pursuant to § 9.3 of the MSA. (Doc. 43, Exh. 1, MSA, § 9.3, p. 12). However, the terms of the MSA and Work Order 1 are not clear and unambiguous concerning the payment of Deferred Management Fees under the facts presented here. Gilead argues that the attainment of project milestones was a precondition to the payment of Deferred Management Fees, which CTI disputes. While Work Order 1 indicates that 30% in project and site management fees is allocated to milestones, the Work Order does not provide that the attainment of those milestones was a precondition to the payment of those fees. In addition, the MSA does not in any manner tie payments for services rendered to the achievement of such project milestones. Moreover, neither the MSA nor Work Order 1 addresses the matter of payment of the Deferred Management Fees in the event the

18

parties' Agreement is terminated. The parties' Agreement is not clear and unambiguous in this regard.

In short, the parties do not dispute that no Study milestones were ever reached due to termination of the Study by Gilead. The parties do dispute whether CTI was entitled to payment of the Deferred Management Fees irrespective of whether a particular Study milestone was reached. The parties also dispute whether Gilead was required to pay Deferred Management Fees for project and site management services rendered in the event Gilead terminated the Agreement. Gilead relies on various provisions of the parties' Agreement to argue the Deferred Management Fees were not payable unless Study milestones were met, which never occurred. CTI likewise relies on the terms of the parties' Agreement to argue that the Deferred Management Fees were payable for each month of the Study and were owed upon termination of the Study, regardless of whether milestones were actually met. Neither interpretation is clearly unreasonable given that the terms of the Agreement do not unambiguously address: (1) whether the services attributable to Deferred Management Fees were rendered prior to the effective termination date so as to come within the purview of § 9.3; (2) whether the attainment of specific milestones was intended to be a necessary precondition to the payment of Deferred Management Fees; and (3) whether the fees were to be paid for the months the Study was in effect in the event the Agreement was terminated.

Accordingly, because the contract terms are not clear and unambiguous, it is necessary to examine the extrinsic evidence to determine whether CTI is entitled to the Deferred Management Fees it seeks. *See United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 834-35 (Del. Ch. 2007) (where a contract is ambiguous, the parties are permitted to introduce extrinsic evidence of the negotiation process to establish the contract's meaning).

CTI argues that Gilead has repeatedly admitted that its payment obligation includes all Deferred Management Fees, which would make it obligated for 100% of the contracted monthly rate for project and site management. (Doc. 43). CTI further asserts that Gilead has admitted that its "Final Accounting obligation to pay 'all unpaid and undisputed amounts'" is not based on what Study milestones had been achieved at the time of the Study termination. (*Id.* at 15). In support of its position, CTI relies on internal Gilead email communications and email communications between CTI and Gilead representatives which predate Gilead's receipt of CTI's Final Invoice. (Doc. 43 at 15-16, 23-24, citing Exhs. 12, 16, 17).

CTI also relies on the deposition testimony of Gilead representatives in support of its position. (*Id.* at 24, citing Doc. 50, Vance Depo. II, pp. 324, 326, 512 - Gilead decided to perform its final reconciliation based on work actually performed and not on milestones); Jon Behrens Depo., p. 80 - milestones were not important to the final accounting). CTI contends that Gilead has described the Deferred Management Fees as a "'management accountability' mechanism to ensure that CTI would perform adequately throughout the Study" rather than as fees that CTI earned only upon the achievement of certain milestones. (Doc. 43 at 15, citing Work Order 1, Exh. 2, Tab III, p. 1; Exh. 2, Tab IV, p. 1; Doc. 50, Vance Depo. II, p. 429 - "In the end . . . there was a lot of back-and-forth regarding what was owed and trying to interpret it in the framework of the milestones which just didn't make sense. Certain milestones had prepayments for activities that were not performed such as the project management and the site management. . . .").

Gilead argues that the Court cannot rely on emails that predate CTI's February 2, 2010 Final Invoice to construe the meaning of the parties' Agreement because Vance wrote the emails before she knew the substance of CTI's assertions and before she and others at Gilead, including

Gilead's attorneys, had an opportunity to review and analyze the terms of the MSA and Work Order 1. (Doc. 64 at 24). In addition, Gilead argues CTI is not entitled to rely on the email from its in-house attorney Wang to CTI's general counsel Ritter to establish the undisputed amounts owing under § 9.3 because the email reflects an offer to settle the parties' dispute in full for less than the total amount CTI claims is due. (*Id*. at 11-13). Gilead contends that as such, Gilead's offer is an inadmissible settlement offer under Fed. R. Evid. 408.

Upon review of the extrinsic evidence submitted by the parties, the Court finds that far from demonstrating that the parties intended that Gilead would be obligated for 100% of project and site management fees upon termination of the contract, the emails show that the parties were uncertain as to how this aspect of their Agreement should be interpreted and reached differing conclusions. On January 14, 2010, prior to receipt of the February 2, 2010 Final Invoice from CTI, Vance and CTI's Vice-President and General Counsel, Ritter, exchanged a series of emails. (Doc. 43, Ex. 12). Vance indicated in that email exchange that she believed Gilead owed 100% of the monthly project and site management fees. Vance informed Ritter that based on his representation that cancellation terms allowed for 60 days of fees to be paid, she would "revise [her] assumption" to "assume" Gilead owed "remaining management fees through January 2010." (*Id*.). Vance listed the "Outstanding Balance to be Paid through 60 d post communication of study cancellation" as follows:

- Jan management fees
- Unpaid Management proportion for the respective number of months of the project in 2009-Jan 2010 that were otherwise allocated to future milestones (30% of total management cost paid through Jan 2010)

Vance calculated the "Total MM [Monthly Management] incurred in project $92,556 x May -Jan 2010 or 9 months = $833004 (70%) ($740451 invoiced to date"). (*Id*.). She determined the remaining balance to be paid was as follows:

21

- 30% allocation of MM allocated to milestone yet to be paid for 9 months of study = $1190006-$833004 = $357002
- Outstanding final month Jan MM = $92556 + $357002 = $449,558 remaining balance to be paid to CTI

Vance asked Ritter that in the event CTI believed there were any other fees that pertained to the project, Ritter send the information to Gilead so that the final reconciliation could be completed. (*Id.*).

Prior to receipt of the February 2, 2010 Final Invoice, Gilead representatives discussed among themselves what monthly payments were required to be paid in light of the contract termination. In an email exchange on January 14, 2010, between Vance and Troy Bienemann of Gilead, Bienemann noted that milestones may not have been completed and he questioned whether Gilead was responsible for "accrued work towards those Milestones[.]" (Doc. 43, Exh. 16). Vance responded in part: "The only amount owed should be related to monthly management for Jan[uary] and the allocation of monthly management withheld (30) for the 9 months worked[.] Recall we gave them a prepayment upon contract signature for 1st year milestones and this needs to be credited back towards the remaining amount owed." (*Id.*). Bienemann replied that Gilead had been invoiced through December and was responsible for the following revised amount: "January MM fees of $92,556 + MM fees withheld of $66,826 + site closure fees of $137,286 (EU + Aus + US) less prepay credit -$53,549. Our revised estimate is $243,119." (*Id.*). Vance responded that the monthly management fees owed were "significantly more." (*Id.*). She stated that the "monthly management" that had been invoiced was only 70% of what was owed and Gilead needed to pay CTI the 30% that had been held back, which she calculated to equal "357K for the 9 month + Jan MM-prepay credit for milestone NOT achieved." (*Id.*).

Following receipt of the February 2010 Final Invoice, Gilead representatives communicated via email among themselves and exchanged emails with CTI representatives indicating that Gilead was attempting to clarify the amount it believed to be due for the final payment and showing the parties disagreed concerning the amount shown as due and owing on the Final Invoice. (Doc. 73, Exhs. 2, 3, 4, 9). On March 18, 2010, Vance sent an internal email stating that Gilead was "in dispute with the final invoices for CTI" and that no invoice should be paid until the dispute was resolved. (Doc. 43, Exh. 14). As of April 23, 2010, Gilead's internal emails show its representatives were still uncertain as to the amounts owed. (Doc. 73, Exh. 9).

Thus, rather than demonstrating that the parties did not dispute whether their Agreement required the payment of Deferred Management Fees to CTI, the parties' internal communications and the communications among the various company representatives show that the parties disagreed as to whether these fees were due and owing under the circumstances of their contract termination. The deposition testimony provided by Vance further highlights the parties' disagreement. Vance testified at her deposition that the Final Invoice was disputed because it included payments for services that had not been completed by CTI and therefore were not owed. (Doc. 50, Vance Depo. II, pp. 333-34). Vance testified that Gilead disputed CTI's calculations of what the Final Invoice would be as of February 2, 2010, because "it was not actually calculated per the terms of our cancellation probations (sic) in our MSA." (*Id.* at 333). Vance testified that her interpretation and response to the Final Invoice was that it included payments for services that had not been completed by CTI and the amounts therefore were not owed. (*Id.* at 333-34). Vance testified that after initially concluding that those fees were owed, she subsequently came to the conclusion that the 30% Deferred Management Fees were not owed under the parties' Agreement and she retracted her earlier statement indicating they would be

owed. (*Id*. at 370). Vance testified that she came to the conclusion on February 15, 2010, that the 30% fees would not be paid, apparently because enrollment milestones had not been achieved. (*Id*.). Vance testified that the conclusion was "based on the . . . fact that the 30 percent went to milestones and related to enrollments, and enrollment was not an activity that had been achieved yet. So it's based on the understanding of what services had been rendered per what the contract states." (*Id*. at 372). She further testified that her understanding was based on Work Order 1 and the budget. (*Id*. at 373). Vance testified that the payments had not accrued for work that had been performed. (*Id*. at 381).

The email and deposition evidence of record demonstrates that after CTI submitted the Final Invoice on February 2, 2010, the parties disagreed as to whether the Deferred Management Fees were owed upon termination of the Agreement by Gilead. The undisputed evidence does not establish whether the parties intended that Deferred Management Fees would be payable under their Agreement upon termination of the Study, irrespective of whether any Study milestones were met. It is for a jury to consider the extrinsic evidence in light of the parties' Agreement and determine whether the parties intended such fees to be due and payable under the circumstances presented by this case. Accordingly, CTI should not be granted summary judgment on its claim for Deferred Management Fees under Count I of the complaint.

## C. CTI is not entitled to summary judgment on its claim for January 2010 Monthly Management Fees.

The terms of the parties' Agreement are likewise not clear and unambiguous as to whether Gilead was required to pay the 70% Monthly Management Fees for January 2010. As evidence that such fees are owed for January 2010, CTI relies on the billing provisions of Work Order I, which indicate that Monthly Management Fees are owed for "the Total Duration of the Project." (Doc. 43 at 24). CTI contends that the Monthly Management Fees were calculated by

dividing 70% of the total amount owed by Gilead by 39 months, the expected duration of the project. (Doc. 43 at 22, citing Work Order 1, Exh. 2, Tab. III, p. 1; Tab IV, pp. 1-2). CTI argues that because the project extended through January 30, 2010, it is entitled to the portion of the Monthly Management Fees allocated to the month of January under Work Order 1. (*Id*.). CTI also relies on extrinsic evidence to support its position, arguing that Gilead acknowledged in emails authored by Vance which predated the Final Invoice that Gilead was obligated to pay fees for all nine months of the Study. (*Id*. at 23, citing Exhs. 12, 16). In addition, CTI relies on deposition testimony Vance gave acknowledging that Gilead was required to pay Monthly Management Fees to CTI every month. (*Id*. at 14, citing Doc. 50, Vance Depo. at 284-85).

Gilead argues that CTI cannot collect Monthly Management Fees for January 2010 because pursuant to § 9.3 of the MSA, CTI is entitled to payment only for services rendered prior to the contract's effective termination date, and CTI did not perform any services during January that would entitle it to such fees. (Doc. 64 at 19-20). Gilead asserts that CTI has produced no evidence showing that CTI performed any services to earn January 2010 management fees. Gilead contends the absence of any such evidence is consistent with deposition testimony provided by Vance that all wind-up activities for the project should have been completed in December 2009. (*Id*. at 20, citing Doc. 50, Vance Depo. II, p. 376 - project management services following cancellation were so minimal they should have been completed within the month of December and they therefore were omitted from Gilead's final reconciliation).

CTI has not carried its burden to show there are no disputed issues of fact and that it is entitled to summary judgment on its claim for payment of January 2010 Monthly Management Fees. Read in isolation, § 9.3 of the MSA would require payment only for those project and site management services actually rendered prior to the termination of the contract. However, the

MSA must be read in conjunction with Work Order 1. Work Order 1 states that the Monthly

Management Fees will be "Billed Monthly for the Total Duration of the Project," which can

reasonably be interpreted to mean that CTI is entitled to fees for each month the Study is in

effect. Nonetheless, Work Order I is not clear and unambiguous in this regard because there are

no provisions that specifically address whether such fees must be paid during the Notice Period

in the event of a contract termination.

Gilead argues that the terms of the MSA control over the billing provisions of the Work

Order concerning this particular matter pursuant to MSA § 10.11, which provides that the MSA

will generally govern if there is any conflict between the terms of the MSA and the Work Order.[6]

(Doc. 43, Exh. 1, MSA, § 10.11, p. 14). Gilead contends that the issues presented by CTI's

motion relate to what payments are owed for the Notice Period and not what type of services

were to be performed during that period. However, the exception set forth in § 10.11, which

states that "the Work Order shall govern as to the specific Services in the Work Order," would

appear to apply to the Monthly Management Fees since Work Order 1 specifically addresses

those services and the billing structure for the services. (Doc. 64 at 21). Work Order 1 does not

specify whether Monthly Management Fees must be paid for each month of the Study in the

event of a contract termination, nor does the MSA clearly preclude payment of the fees. Given

these ambiguities, CTI is not clearly entitled to Monthly Management Fees for January 2010

under the terms of the parties' Agreement.

Beyond issues of contract interpretation, there are genuine issues of material fact as to the

project and site management services rendered in January 2010. Gilead initially assumed during

---

[6] Section 10.11 states: "If there is any conflict between the terms of any Work Order and this Agreement, the conflict shall be resolved by interpreting the provision in the following order of priority: (1) this Agreement, and (2) the Work Order, unless specifically stated otherwise, and except that the terms of the Work Order shall govern as to the specific Services in the Work Order." (Doc. 43, Exh. 2, MSA. § 10.11, p. 14).

attempts to reconcile the final amount owing under the Agreement that project and site management services could have been and were rendered in January 2010. (Doc. 50, Vance Depo. II, p. 376). However, Vance testified that Gilead's final resolution was that the activities Gilead "actually asked to be performed following cancellation were so minimal that they should have been . . . completed very reasonably within the month of December," so that Gilead "did not include January" in the final reconciliation. (*Id.*). CTI does not point to any other evidence of record that clearly establishes the project and site management services, if any, CTI actually performed during January of 2010.

Because genuine issues remain as to CTI's entitlement to Monthly Management Fees for January 2010, CTI is not entitled to summary judgment on its claim for such fees.

**D. There is a genuine issue of material fact as to the amounts owed under the Agreement.**

CTI argues it is undisputed that even after Gilead is credited for its payments to date, it still owes CTI "at least $416,420.77," and of that total Gilead admittedly owes $143,337.92. (Doc. 43 at 17). CTI contends that Gilead calculated $143,337.92 to be the remaining balance owed under the Agreement. (*Id.*). CTI relies on a May 6, 2010 email from Gilead's in-house attorney, Sue Wang, Director of Corporate Legal Affairs, to CTI's Maria Marsh, Kathy Schroeder and general counsel, Paul Ritter, to establish the undisputed amounts owing under the Agreement. (Doc. 43, Exh. 13). CTI argues that the difference between what CTI claims is owed and the amount Gilead has calculated to be the remaining balance, $273,082.85, is indisputably attributable to unpaid management fees. CTI further asserts that "Gilead's own documents and admissions establish that it owes CTI at least $416,420.77." (Doc. 73 at 12).

Gilead denies that it has admitted owing $143,337.92 and asserts that the entire February 2, 2010 invoice is disputed. (Doc. 64). Gilead acknowledges that it sent CTI an email offering

to pay the amount CTI argues is not in dispute, but Gilead contends the amount it put forward is part of a settlement offer that is inadmissible in evidence. (*Id*. at 11-13). Gilead further argues that summary judgment should be denied and that it is entitled to withhold credit for project and site management fees because CTI breached the provisions of Work Order 1, Exh. III, p. 1, and Exh. IV, pp. 1-2 (Task. H.2), regarding site management staffing by improperly allocating the time of CTI's regional clinic lead individual, Michelle Vermillion, who was obligated to allocate 100% of her time to site management for the Study. (Doc. 64 at 21-22, citing Doc. 50, Vance Depo. II, pp. 272-75, 472-77). Gilead contends there are genuine issues of material fact as to: (1) whether CTI complied with its contractual obligations to allocate 100% of site management time to the Study, (2) whether its failure to comply was a material breach of the parties' Agreement, and (3) the amount Gilead is entitled to withhold for site management fees as a result of the breach. (*Id*. at 22). Finally, Gilead argues that CTI's calculation of $273,082.85 for monthly project and site management fees is mathematically incorrect because it fails to take into account $124,464 in monthly payments that Gilead made to CTI from May 2009 to December 2009 for 70% Monthly Management Fees. (Doc. 64 at 22-23, citing Exh. 15). Gilead argues that CTI's claim for $273,082.85 should therefore be reduced to $148,618.85. (*Id*. at 23).

In reply, CTI argues that Gilead's witnesses have consistently admitted there are "undisputed amounts still owed to CTI" ranging from $449,558.00 (1/14/10 email from Vance to Ritter, Doc. 43, Exh. 12), to $143,337.92[7], to "some money" (Doc. 50, Vance Depo, II, p. 516). (Doc. 73 at 3). CTI argues that Gilead cannot avoid its obligations to pay the undisputed portion of the Final Invoice by disputing any part of the invoice because Work Order 1 requires payment of the "undisputed amount" of an invoice when "any portion" is disputed. (Doc. 73 at 5, citing

---

[7] This amount is taken from the May 6, 2010 email from Wang to CTI (Doc. 43, Exh. 13). For the reasons discussed below, the Court finds the email is not admissible into evidence under Fed. R. Evid. 408.

Work Order 1, Doc. 43, Exh. 2, Tab I, p. 60, ¶ 7; Exh. 2, Tab II, p. 61, ¶ 7). CTI contends it submitted a properly reconciled and supported Final Invoice, it provided all information Gilead requested (Doc. 73 at 4, citing Exhs. 1, 2, 3, 4, 5), and it communicated with Gilead for a number of months on this point. (*Id.*, citing Doc. 43, Exh. 12; Doc. 73, Exhs. 6, 7, 8). CTI also contends that Gilead cannot deny that it owes $416,420.77 because this amount is based on Gilead's own calculation of what it has paid and what it owes. (Doc. 73 at 7, citing Doc. 43, Exh. 18). In addition, CTI contends that Gilead's argument concerning CTI's allegedly erroneous failure to credit Gilead with payments for site management services simply demonstrates that Gilead is admitting that CTI was owed money for "H.2 Site Management" services, that Gilead should have allocated some of its payments to that line item, and Gilead therefore owes more money than it has admitted. (Doc. 73 at 7-8).

Initially, the Court will address Gilead's argument that the May 6, 2010 email from Wang to CTI (Doc. 43, Exh. 13) is not admissible into evidence because the email is part of a settlement offer made to resolve a dispute between the parties pertaining to the amount claimed for services by CTI under the parties' contract as set forth in the February 2, 2010 Final Invoice. Wang's email states, in pertinent part:

> Gilead has performed a detailed analysis of the invoice and budget grids received by CTI related to [Work Order 1] pursuant to the [MSA] and has determined that the total amount owed by Gilead to CTI is $1,309,267 for the period beginning April 20, 2009 and ending January 31, 2010. To date, Gilead has provided payment to CTI in the amount of $1,165,929. Therefore, the remaining balance owed to CTI is $143,337.92. The attached spreadsheets include the detail on how this amount was calculated.

> I have reviewed this matter with our General Counsel and other members of management. We disagree with CTI's position that Gilead has an obligation to pay for services that reasonably would have been performed had there been no termination. Gilead's position with regard to final payment obligations is expressly described in Sections [sic] 9.3 of the CTI Master Services Agreement. We are prepared to provide you with a final payment for the remaining balance of

$143,337.92 to resolve this matter in full. If this remaining amount is acceptable
to you to conclude this matter, please let me know and we will initiate payment.

(Doc. 43, Exh. 13). Gilead contends that this email is a settlement offer its in-house counsel

made to CTI's in-house counsel in a good faith effort to settle the parties' dispute. (Doc. 64 at

11-13). In support of its position, Gilead relies on Wang's deposition testimony that the amount

stated in the email was specifically offered in settlement of the parties' dispute and to resolve the

matter in full. (*Id*. at 14, citing Doc. 64, Exh. 11).

CTI contends that Gilead has not met its burden of showing that Rule 408 applies. (Doc.

73 at 8-12). CTI asserts that courts have held there is no dispute for purposes of Rule 408 until

the parties' discussions have reached a clear-cut off point, which is threatened litigation. CTI

also contends that settlement negotiations cannot be taking place until both sides acknowledge

that such negotiations are in fact transpiring, which did not occur here. (*Id*. at 9). CTI notes that

throughout the parties' five months of discussions and attempts to reconcile the final costs,

neither party made any reference to settlement. CTI alleges that Wang's email simply reflects

Gilead's calculation of what it still owed CTI. (*Id*. at 9-10). CTI further asserts that the fact the

email was sent by Gilead's in-house counsel is immaterial as Wang was not involved in

developing Gilead's final reconciliation attached to the email, she did not review the

reconciliation, and she does not recall making any inquiries about the reconciliation within

Gilead. (*Id*. at 10-11). CTI contends it is clear from the context of the parties' discussions that

the email reflects the culmination of business discussions rather than settlement negotiations.

(*Id*. at 11).

Rule 408 prohibits a party from offering or from admitting evidence of "conduct or

statements made in compromise negotiations regarding the claim." *Eid v. Saint-Gobain*

*Abrasives, Inc.*, 377 F. App'x 438, 443-444 (6th Cir. 2010) (citing Fed. R. Evid. 408(a)).

Specifically, a party's statement cannot be used "to prove liability for, invalidity of, or the amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." *Id.* at 443, n.5 (citing Fed. R. Evid. 408(a)). Rule 408 promotes the "resolution of disputes short of litigation, thereby conserving scarce judicial resources," by recognizing that "settlements are more likely to result when parties are free to speak openly during settlement negotiations, without fear that what is said can be used against them at trial." *Id.* (citing *Korn, Womack, Stern & Assocs. v. Fireman's Fund Ins. Co.,* 27 F.3d 566, 1994 WL 264263, at *6 (6th Cir. June 15, 1994)). The Rule also seeks to exclude irrelevant evidence, recognizing that "disputes are often settled for reasons having nothing to do with the merits of a claim." *Id.* The party invoking Rule 408 to bar the admission of evidence bears the burden to provide its applicability to the evidence at issue. *Foreword Magazine, Inc. v. Overdrive, Inc.,* No. 1:10-cv-1144, 2011 WL 5169384, at *6 (W.D. Mich. Oct. 31, 2011).

The Court finds for summary judgment purposes that the May 6, 2010 email from Gilead's in-house counsel, Wang, to CTI's in-house counsel, Ritter, and other CTI representatives is inadmissible under Fed. R. Evid. 408. The content and context of Wang's email shows the statement offering the specified payment amount was "made in compromise negotiations" regarding CTI's claim for payment of amounts CTI claimed it was owed under the parties' agreement. Wang, in her capacity as in-house counsel for Gilead, made an offer to CTI on behalf of Gilead "to resolve" the matter of the parties' payment dispute "in full." (Doc. 43, Exh. 13). The offer was made "to conclude this matter" after a series of back and forth attempts among the representatives for the parties to resolve their dispute over the final amount owed CTI under their Agreement. (*Id.*). As CTI itself notes, there is no indication that Wang was involved in the actual calculation of the amount Gilead offered, and it appears she did not become

involved in the communications with CTI until it was evident the parties disputed the final amount. The fact that litigation had not been threatened at this point or that the parties did not use the word "settlement" in their communications is not material. CTI does not cite any authority from the Sixth Circuit or any provisions of the Federal Rules that require these conditions to be met before Rule 408 can apply. The authorities plaintiff cites for the proposition that Rule 408 cannot apply unless the parties have reached the point of a formal dispute or threatened litigation, and the parties have acknowledged they were engaged in settlement negotiations, are not binding on this Court. (*See* Doc. 73 at 11, citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977); *FDIC v. WH Venture*, Civ. A. No. 84-5673, 1987 WL 14856 (E.D. Pa. July 29, 1987); *Lee Middleton Original Dolls, Inc. v. Seymour Mann, Inc.*, 299 F. Supp.2d 892, 895 (E.D. Wis. 2004)). Moreover, imposing such requirements would not further the purposes of the Rule. Accordingly, the Court declines to interpret the Rule so restrictively. Because the amount offered by Wang appears to have been a compromise offer that was intended to resolve the parties' ongoing dispute in full, the Court finds for summary judgment purposes that the email is not admissible into evidence to show the amount owing under the parties' contract.

Even if the Court were to find that Rule 408 does not bar consideration of the May 2010 email and attached budget grids for purposes of the summary judgment motion, the email and budget grids do not constitute an admission by Gilead as to the actual amounts that may be due and owing under the contract. Gilead denies that the email and supporting budget grids were "a final, formal accounting of work actually performed by CTI. . . ." (Doc. 64 at 14-15). Gilead contends that it could not produce an accurate formal accounting because CTI possessed the supporting documentation necessary to determine the work CTI actually performed. (*Id.* at 15).

Gilead further argues that a "true formal accounting" of amounts due to CTI under the Agreement would yield a lower amount than the figure included in the May 2010 email because there are instances where Gilead gave CTI full credit for activities that were only partially completed and therefore were not compensable under the Agreement. (*Id.* at 15, citing Doc. 50, Vance Depo. II, pp. 460-61, 512-17). CTI disputes Gilead's assertions. CTI contends that it gave Gilead all the information Gilead requested to perform its final accounting and that Gilead was therefore able to determine the undisputed amounts owed. (Doc. 73 at 4-6). In light of the parties' factual disputes concerning the May 2010 email and supporting budget grids, the email and budget grids, even if admissible into evidence, do not constitute an admission by Gilead as to the undisputed amounts owing under the Agreement.

The evidence of record shows that there are genuine issues of material fact as to the amount Gilead owes CTI under the parties' Agreement. CTI takes inherently contradictory positions on this point. CTI posits it is undisputed that Gilead owes $143,337.92 while simultaneously asserting that there is no genuine issue of material fact that Gilead owes at least $416,420.77 (Doc. 73 at 6 ); that Gilead has admitted owing varying amounts ranging from $449,558.00 to $143,337.92 to "some money" (Doc. 73 at 3); and that Gilead's arguments presented in the opposing memorandum show Gilead owes more money than it has admitted. (Doc. 73 at 8). By CTI's own admissions and according to the evidence presented, the parties dispute the amounts owing for project and site management under the terms of the contract, and there are genuine issues as to the payments due to CTI for these services. As Gilead is required to pay only "undisputed amounts for Services rendered" under the parties' Agreement (*see* MSA, § 9.3), and the final amount due is clearly in dispute and dependent on the resolution of genuine factual issues, the amount due and owing CTI cannot be determined on summary judgment.

Rather, it is for the jury to resolve the parties' dispute and determine the amounts owed under the terms of the parties' Agreement.

There are genuine issues of material fact as to the amounts owing under the parties' Agreement. In addition, issues remain concerning Gilead's claim that CTI breached the Agreement by failing to allocate staff in accordance with the requirements of the Agreement. For these reasons, CTI's motion for partial summary judgment on Count I of the complaint (Doc. 43) should be denied.

### 3. Defendant Gilead's motion for summary judgment on Counts II and III of the complaint (Doc. 46) should be granted.

Defendant Gilead moves for summary judgment on Count II of the complaint (unjust enrichment) and Count III of the complaint (quantum meruit). In support of its unjust enrichment claim, CTI alleges that it has provided services and benefits to Gilead for which defendant has failed and refused to compensate CTI and that Gilead will be unjustly enriched in an amount in excess of $1,048,599 if it is not required to reimburse CTI for the services and benefits conferred on it. (Doc. 2, ¶¶ 32-34). In support of its quantum meruit claim, CTI alleges that it has provided services and benefits to Gilead in initiating, running and managing a clinical study program for Gilead, CTI has not been fully compensated for the services and benefits provided to Gilead, the reasonable value of its uncompensated services to Gilead is in excess of $1,048,599, and CTI is entitled to payment from Gilead in that amount, plus interest, costs, and attorney fees. (Doc. 2, ¶¶ 35-37).

Gilead moves for summary judgment on CTI's claims for unjust enrichment and quantum meruit on the ground that because the parties entered into a signed Agreement (the MSA and Work Order 1) that governs their relationship and dispute, CTI's only possible avenue for relief is a breach of contract claim.

In response, CTI contends that dismissal of its equitable claims is not required under Delaware law. CTI asserts that where the parties to a lawsuit have an express contract, Delaware law requires dismissal of an equitable claim only where such claim "is part of the contract in question." (Doc. 65 at 3). CTI asserts that there must be a direct nexus between the contract and the specific equitable claim in order for the existence of a contract to bar the equitable claim. (*Id*. at 4). CTI contends it is unclear at this stage whether its equitable claims are encompassed by the parties' contract and whether there is a direct nexus between the parties' Agreement and the unjust enrichment and quantum meruit claims. (*Id*.). CTI contends that while the parties' relationship was governed *primarily* by the MSA and Work Order 1, the parties dispute whether certain damages claimed by CTI fall within the scope of the parties' contractual agreement. Specifically, CTI contends that while Gilead admits the MSA required it to pay CTI for "work actually performed," Gilead denies that it was required to pay "other elements of CTI's claimed damages," such as CTI's up-front costs. (*Id*.). CTI thus alleges that Gilead denies that up-front costs fall within the scope of the parties' Agreement. (*Id*.). CTI contends that if it is correct that its up-front costs are compensable under the contract, then its equitable claims are not properly brought because the damages sought can only be the subject of a contract action. (*Id*. at 8). Conversely, CTI asserts that if Gilead is correct in arguing that the contract does not cover the costs CTI seeks to recover, then CTI may properly assert its equitable claims. CTI contends that because there are genuine issues of material fact as to which of its claimed damages are the subject of the parties' Agreement, and because any costs that are not covered by the Agreement may be the subject of its equitable claims, summary judgment is not appropriate. (*Id*. at 4-5).

In reply, Gilead contends that there is no dispute that the MSA and Work Order 1 are fully integrated contracts which therefore encompass the parties' entire agreement. (Doc. 75 at

7-8, citing Doc. 43, Exh. 1, MSA, § 10.11, p. 14 - "This Agreement, together with any

attachments and exhibits referenced herein . . . and any Work Orders . . . set forth the complete,

final and exclusive agreement between the Parties. . . ."). Gilead further contends that the

subject of CTI's unjust enrichment and quantum meruit claims - the start-up costs which are

purportedly beyond the scope of the parties' Agreement - are, contrary to CTI's argument,

expressly governed by § 3.3 of the MSA, which encompasses "actual or potential out of scope

work."[8] (Doc. 75 at 8). Gilead argues that because the language of § 3.3 necessarily

encompasses any work that CTI performed under the parties' Agreement, including any start-up

work in connection with the Study, CTI cannot pursue damages for such costs under equitable

theories of recovery. (*Id.*, citing *J.A. Moore Constr. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F.

Supp. 982, 989 (D. Del. 1988) (holding equitable claims such an unjust enrichment or quantum

meruit could not "be the basis of a claim for extras or modifications since a procedure for

approval of and compensation for this work" was provided for in the parties' written contracts)).

   Delaware courts have found that equitable claims for unjust enrichment and quantum

meruit may not be brought where an express agreement governs the dispute between the parties.

*Tolliver v. Christina Sch. Dist.*, 564 F. Supp.2d 312, 315 (D. Del. 2008) ("[T]he existence of an

express, enforceable contract that controls the parties' relationship will defeat an unjust

enrichment claim[.]") (citation omitted); *Chrysler Corp. v. AirTemp Corp.*, 426 A.2d 845, 854

(Del. Super. 1980) (under Delaware law, recovery under the theory of quantum meruit may be

---

[8] Section 3.3 of the MSA provides: "Unauthorized Work: CTI will not perform work outside the scope of a Work Order or exceed expenses under a Study Budget without the prior advance written authorization from a duly authorized Gilead representative. CTI shall notify Gilead in writing of any actual or potential out of scope work and related expenses (or Pass-through Expenses) within 10 business days of CRO's first knowledge of such actual or potential out of scope work and related expenses. Gilead will consider any such reasonable actual or potential out of scope work and related expenses in CTI's notice. The Parties will discuss in good faith and use commercially reasonable efforts to mutually agree upon the treatment of any actual or potential out of scope work and related expenses of which Gilead has been notified pursuant to this section; however, Gilead shall not be under any obligation to pay CTI for any out of scope work that is not authorized by both Parties in a written amendment for Services under a Work Order and its applicable Study Budget." (Doc. 43, Exh. 1, MSA, p. 5).

had "only if it is determined that the relationship of the parties is not governed by an express

contract") (citations omitted). *See also Related Westpac LLC v. JER Snowmass LLC*, C.A. No.

5001-VCS, 2010 WL 2929708, at *7 (Del. Ch. July 23, 2010) (court dismissed unjust

enrichment claim where parties' dispute was governed by terms of their operating agreements);

*James L. Webb Paving Co., Inc. v. Clark*, No. CIV.A.02-09-0115, 2003 WL 1848646, at *2 (Del.

C.P. Mar. 7, 2003) (dismissing quantum meruit claim because the parties' relationship was

governed by an express agreement). The Court in *Ameristar Casinos, Inc. v. Ameristar E.*

*Chicago Holdings, LLC.*, No. CIV.A. 3685-VCS, 2010 WL 1875631, at *13 (Del. Ch. May 11,

2010), explained the logic behind the general rule of dismissing claims of quantum meruit and

unjust enrichment when an express contract governs the parties' relationship:

> The logic behind those rules is simple: if a contract covers the subject matter, the
> defendant's conduct either violates the contract or not. If the defendant did not
> violate the contract governing the subject of the dispute, then the plaintiff cannot
> attempt to hold the defendant responsible by softer doctrines, and thereby obtain a
> better bargain than he got during the contract negotiations.

Here, it is clear that the parties' relationship and dispute are governed by the MSA and

Work Order I, which are fully integrated contracts and encompass out of scope work. *See* MSA

§§ 10.11, 3.3. In view of the express provisions of the MSA, it cannot reasonably be disputed

that CTI's claims arise out of the contract that the parties negotiated. CTI's rights are limited to

those set forth in the parties' Agreement, and whether it is entitled to the damages it seeks is a

matter of contract interpretation. CTI is either entitled to the payments it seeks under the terms

of the parties' Agreement, or it is not entitled to those payments. CTI cannot now attempt to

obtain more than it bargained for by going beyond the terms of the parties' Agreement. The

existence of the parties' express agreement which covers the subject matter of CTI's claims

precludes an implied promised to pay for work under a theory of unjust enrichment or quantum

meruit. *See J.A. Moore Const. Co.*, 688 F. Supp. at 989. CTI's only avenue for relief is through its breach of contract claim. Gilead's motion for summary judgment on CTI's claims for unjust enrichment and quantum meruit should therefore be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. Plaintiff CTI's motion for partial summary judgment on Count I of the complaint (Doc. 43) be DENIED.

2. Defendant Gilead's motion for partial summary judgment on Count I of the complaint (Doc. 45) be GRANTED, and plaintiff be barred from pursuing the second component of its claim for damages under Count I consisting of payment for work it would have performed during the Notice Period.

3. Defendant Gilead's motion for partial summary judgment on Counts II and III of the complaint (Doc. 46) be GRANTED and these claims be DISMISSED.

Date: 4/15/13

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CTI CLINICAL TRIAL SERVICES, INC.,        Case No. 1:10-cv-491
     Plaintiff,                            Weber, J.
                                            Litkovitz, M.J.

     vs.

GILEAD SCIENCES, INC.,
     Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).